[632 NYS2d 139]

Winston Cox et al., Appellants, v Kingsboro Medical Group et al., Defendants, and Brookdale Surgical Associates et al., Respondents.

Second Department, September 18, 1995

APPEARANCES OF COUNSEL

*McLaughlin & McLaughlin*, Brooklyn *(Harold McLaughlin* of counsel), for appellants.

*Aaronson, Rappaport, Feinstein & Deutsch*, New York City *(Jean Delaney Smith* of counsel), for respondents.

**OPINION OF THE COURT**

SULLIVAN, J.

I

We hold today that a plaintiff in a medical malpractice action may not avoid the effect of CPLR 214-a by attempting to impute continuous treatment by one physician to another physician based solely upon allegations of a vague and amorphous "relationship" between the two medical professionals.

The injured plaintiff, Winston Cox, had a history of varicose veins and was a patient of the defendant Kingsboro Medical Group (hereinafter Kingsboro). In the course of treatment, Kingsboro referred Mr. Cox to the defendant Brookdale Surgical Associates (hereinafter Brookdale) for diagnostic testing. As conceded by the plaintiffs' counsel, "Brookdale Surgical Associates were vascular surgeons *who were independent* of [Kingsboro] and who saw patients [who] were referred to them by [Kingsboro]" (emphasis supplied).

On March 30, 1988, a Brookdale technician performed noninvasive tests on Mr. Cox, and the defendant Dr. Levowitz, a member of Brookdale, reviewed those test results and dictated a report to Kingsboro on April 1, 1988. The report essentially confirmed Kingsboro's initial diagnosis and ruled out acute deep venous thrombotic occlusions as the cause of Mr. Cox's condition.

Mr. Cox returned to Brookdale's offices on April 6, 1988, to discuss his test results. On that date, he saw Dr. Levowitz for the first and only time. Dr. Levowitz examined Mr. Cox, performed additional doppler studies, and reviewed his previous report, but could not identify the cause of the problem. In his records, Dr. Levowitz noted that Mr. Cox's condition "[w]ill require extensive investigation including venography and possibly MRI to determine the cause. The possibility of an arterial venous fistula cannot be excluded". Dr. Levowitz communicated the need for further investigation to Mr. Cox and closed his notes with the comment "[a]dditional report to Dr. E. Wolf of the Kingsboro Medical Group". However, it appears that no such report was ever sent.

In the ensuing months, Mr. Cox continued to visit Kingsboro because of worsening pain in the affected leg. On August 21, 1989, he was referred to Brookdale Hospital and was seen in an emergency consultation on the following day by the defendant Dr. Flores, who also was a member of Brookdale. Mr. Cox was hospitalized, and, after further tests were performed, his left leg was amputated above the knee. A postamputation examination of the leg confirmed that Mr. Cox had suffered from an apparently longstanding arteriovenous fistula of the popliteal artery and popliteal vein.

The plaintiffs subsequently commenced this malpractice action, serving Brookdale on November 3, 1990, Dr. Flores on November 5, 1990, and Dr. Levowitz on November 8, 1990. Each of these defendants interposed an answer asserting the expiration of the two-year-and-six-month limitations period of CPLR 214-a as an affirmative defense. Following examinations before trial, the defendants moved for summary judgment dismissing the complaint as timed barred insofar as it is asserted against Dr. Levowitz and dismissing those causes of action asserted against Brookdale and Dr. Flores based on treatment allegedly rendered on March 30, April 1, or April 6, 1988 as, *inter alia,* time barred. The Supreme Court granted the motion.

## II

Contrary to the plaintiffs' contention, Dr. Levowitz established his entitlement to judgment as a matter of law under CPLR 214-a, since any alleged malpractice committed by him had to have occurred on April 6, 1988, the only date on which he saw and communicated with Mr. Cox. Inasmuch as service

on Dr. Levowitz was made on November 8, 1990, some two years and seven months later, the action against him was patently untimely. Indeed, nothing offered by the plaintiffs in opposition to the motion for summary judgment and partial summary judgment even suggested any treatment by Dr. Levowitz beyond April 6, 1988. Rather, the plaintiffs principally relied upon the doctrine of imputed or constructive continuous treatment, alleging that Dr. Levowitz misdiagnosed Mr. Cox's condition and that Kingsboro administered treatment based on that misdiagnosis, thus reasoning that the entire period of subsequent treatment by Kingsboro should be imputed to Dr. Levowitz. A similar rationale was employed in *Fonda v Paulsen* (46 AD2d 540), where the Court applied imputed continuous treatment to a pathologist who allegedly had misdiagnosed a biopsy, thereby concluding that an issue of fact existed with respect to whether the action, commenced some five years later, was nevertheless timely.

However, in *McDermott v Torre* (56 NY2d 399, 403), the Court of Appeals held that continuous treatment by a physician could not be imputed to an independent laboratory "in the absence of an agency or other relevant relationship between the laboratory and doctor or some relevant continuing relation between the laboratory and the patient". The Court of Appeals specifically observed that the policy underlying the continuous treatment doctrine would not be advanced by applying the doctrine to a laboratory, since "a laboratory neither has a continuing or other relevant relationship with the patient nor, as an independent contractor, does it act as an agent for the doctor or otherwise act in relevant association with the physician" *(McDermott v Torre, supra,* at 408). Furthermore, in *Meath v Mishrick* (68 NY2d 992), the Court of Appeals relied upon the reasoning in *McDermott v Torre (supra)* in finding that an attending physician's continuous treatment should not be imputed to a hospital pathologist. The Court held that there was no continuing relation between the pathologist and the patient which would advance the policy underlying the continuous treatment doctrine, nor was there a sufficient relationship between the pathologist and the attending physician, notwithstanding that both were affiliated with the hospital where the patient was treated and where the alleged misdiagnosis occurred. Significantly, the Court further observed that to the extent *Fonda v Paulsen (supra)* and its progeny were to the contrary, they should not be followed.

Accordingly, the mere existence of a misdiagnosis upon which other physicians rely is not sufficient to warrant the imputation of continuous treatment, since "the continuing nature of a diagnosis or misdiagnosis does not itself constitute continuous treatment" *(Swift v Colman,* 196 AD2d 150, 153). Applying these principles to the instant case, it was incumbent upon the plaintiffs to establish either a continuing relationship between Dr. Levowitz and Mr. Cox, or an agency or other relevant relationship between Dr. Levowitz and Kingsboro *(see generally, Kavanaugh v Nussbaum,* 71 NY2d 535, 547; *Reeck v Huntington Hosp.,* 215 AD2d 464). The plaintiffs failed to demonstrate either. Mr. Cox only underwent diagnostic testing at Brookdale and then returned on a single occasion to speak with Dr. Levowitz regarding the results. The mere fact that Dr. Levowitz personally examined Mr. Cox, a circumstance to which the dissent attaches great significance, does not mandate the application of imputed continuous treatment or abrogate the principles set forth in *McDermott v Torre* (56 NY2d 399, *supra)* and *Meath v Mishrick* (68 NY2d 992, *supra).* Rather, those principles have been uniformly applied in subsequent decisions *(see, e.g., Pierre-Louis v Ching-Yuan Hwa,* 182 AD2d 55 [where defendant doctor treated plaintiff at cardiology clinic, subsequent treatment by different cardiologist not imputed to defendant]; *De Peralta v Presbyterian Hosp.,* 121 AD2d 346 [where defendant surgeon referred plaintiff to another doctor for physical therapy, the treatment rendered by the therapist could not be imputed to the surgeon]; *Swartz v Karlan,* 107 AD2d 801 [where general practitioner referred plaintiff's decedent to defendant neurologist who diagnosed his condition and treated him, following which plaintiff was treated only by the general practitioner, the neurologist was not charged with subsequent treatment]). In each of the foregoing cases, the defendant physician examined and treated the patient, yet the principles discussed in *McDermott* and *Meath* precluded the imputation of continuous treatment. No greater relationship between Dr. Levowitz and Mr. Cox has been established in this case, nor would the policy underlying the continuous treatment doctrine be advanced by application of that doctrine to these facts *(see generally, Rizk v Cohen,* 73 NY2d 98).

Our dissenting colleagues misapprehend the respective burdens of proof on a motion for summary judgment. It is well settled that "[t]he proponent of a summary judgment motion

must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" *(Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851, 853). As one of the movants for summary judgment, Dr. Levowitz met this burden by establishing that the action was commenced against him more than two years and six months after he last rendered treatment to Mr. Cox. Contrary to the dissenters' view, he had no further obligation to *negate* any potential claim of imputed continuous treatment raised by the plaintiffs *(see, Connell v Hayden,* 83 AD2d 30, 39). Rather, the burden shifted to the plaintiffs to demonstrate the existence of a genuine triable issue of fact regarding the applicability of continuous treatment. However, the plaintiffs merely alleged that continuous treatment should be imputed because Mr. Cox was referred by Kingsboro to Brookdale and therefore Dr. Levowitz should have foreseen that Kingsboro would rely upon any error or omission by him in rendering future treatment to Mr. Cox. As the decisions discussed above make clear, this argument is patently inadequate to support the imputation of continuous treatment by Kingsboro to Brookdale and its member physicians. Significantly, the plaintiffs repeatedly conceded that Kingsboro and Brookdale were separate and independent entities, and they never opposed the motion for summary judgment on the wholly speculative grounds now advanced by the dissent; i.e., that some amorphous "relationship" may exist between Kingsboro and Brookdale as a result of some unspecified "contractual arrangement" or "custom and practice" between the two, or because they are both affiliated with the Health Insurance Plan of Greater New York (hereinafter HIP).

### III

With regard to the existence of an agency or relevant relationship between Dr. Levowitz and Kingsboro, the dissenters' mere statement that Kingsboro is a medical group providing primary care under HIP and that Brookdale is an independent group of specialists to whom Kingsboro may refer HIP subscribers falls woefully short of satisfying the plaintiffs' burden. The plaintiffs have failed to set forth any evidence to demonstrate that the relationship between Kingsboro and Brookdale was in any manner different than that between any independent physician who refers a patient to any other independent specialist. There appears to be no relationship

between Kingsboro and Brookdale (or Brookdale's individual members) other than the aforementioned referrals *(see, Pierre-Louis v Ching-Yuan Hwa,* 182 AD2d 55, *supra; Evra v Hillcrest Gen. Hosp.,* 111 AD2d 740; *Swartz v Karlan,* 107 AD2d 801, *supra).*

Furthermore, it is clear that HIP is a nonprofit membership corporation that sells medical expense indemnity insurance. It provides indemnified medical care through a series of independent contractors or medical groups, with medical services being rendered in accordance with both accepted medical and surgical practices and standards adopted by the Medical Control Board of HIP *(see, Shapiro v Health Ins. Plan,* 7 NY2d 56; *Mitts v H.I.P. of Greater N. Y.,* 104 AD2d 318; *McGrorty v Health Ins. Plan,* 98 AD2d 1000; *Levine v Health Ins. Plan,* NYLJ, May 31, 1985, at 18, col 3). This fact hardly bespeaks the type of relationship that should subject independent contractors to additional liability under the concept of imputed continuous treatment. Rather, a fair reading of *McDermott v Torre* (56 NY2d 399, *supra)* and *Meath v Mishrick* (68 NY2d 992, *supra)* indicates that the relationship between the referring physician and the diagnostician or specialist must *arise out of or pertain to the treatment of the patient* in order to justify the imputation of continuous treatment. Otherwise, virtually any relationship, regardless of how far removed from the actual care of the patient (and thus removed from the goal of the continuous treatment doctrine to foster an ongoing relationship between the patient and the physician from onset to cure) could be used as a predicate for imputing continuous treatment. The mere fact that different physicians accept patients who participate in the same membership health insurance plan is simply too remote a nexus to be of any consequence in determining this issue *(see generally, Meath v Mishrick, supra* [continuous treatment not imputed even though attending physician was affiliated with same hospital where pathologist was employed and where patient was diagnosed and treated]). In any event, the plaintiffs have simply failed to introduce sufficient evidence to raise an issue of fact regarding an agency or other relevant relationship between medical groups and specialists within HIP.

Additionally, we question the dissent's wholly gratuitous discussion of "managed care" in this case. While Mr. Cox is a HIP member, there is no evidence in this record demonstrating that HIP is a managed care plan. Even if it is, implicit in the dissent's discussion is the disturbing suggestion that Dr.

Levowitz, as a consultant, would be subject to imputed contin-
uous treatment in connection with referrals from HIP physi-
cians, but not from other physicians. We are left to ponder
what impact such a rule would have on attempts to enlist
more physicians into managed care plans, and whether such a
policy determination is not more properly within the province
of the Legislature *(see, Ganess v City of New York,* 85 NY2d
733).

## IV

Discovery in this case, including the taking of extensive
depositions, has been completed, and the plaintiffs do not
contend that they need any further disclosure in order to
establish the requisite relationship. Hence, the record does not
support the dissent's unwarranted conclusion that additional
discovery is needed. Similarly, the dissenters' reliance upon
*Colonresto v Good Samaritan Hosp.* (128 AD2d 825) is mis-
placed. Unlike the matter before us, little discovery had been
conducted in *Colonresto* at the time summary judgment was
granted.

Other matters raised in the dissent require comment. The
dissenters contend that the physician-patient relationship be-
tween Dr. Levowitz and Mr. Cox continued for at least a
"reasonable time" beyond their only meeting on April 6, 1988,
because Dr. Levowitz was supposed to send a further report to
Kingsboro and because he anticipated that Mr. Cox would at
some future date be referred back to him. It is sufficient to
note that this novel argument to extend the Statute of Limita-
tions for an unspecified period based on the mere *expectation*
of continuous treatment finds no support in statutory or
decisional law.

Additionally, while the dissent lists numerous purported
issues of fact warranting a trial, the majority of these so-
called issues focuses upon whether the actions of Dr. Levowitz
and others actually constituted medical malpractice. However,
inasmuch as we are concerned here with whether the action
was timely commenced, the question of whether the action
was facially meritorious is irrelevant. The remaining "issues",
concerning the vague alleged "relationship" between Kings-
boro and Brookdale, were not raised in the Supreme Court.
Rather, they are speculative and illusory questions belatedly
manufactured by the plaintiffs and adopted by the dissenters
in an effort to justify the denial of summary judgment. Since

" '[a] shadowy semblance of an issue is not enough to defeat the motion' " *(Capelin Assocs. v Globe Mfg. Corp.,* 34 NY2d 338, 341, quoting *Hanrog Distrib. Corp. v Hanioti,* 10 Misc 2d 659, 660), the plaintiffs failed to sustain their burden in opposing summary judgment.

Accordingly, Dr. Levowitz established his entitlement to summary judgment and the plaintiffs failed to raise a material triable issue of fact in response thereto. Moreover, inasmuch as the claims against Dr. Levowitz may not serve as a predicate for vicarious liability on the part of Brookdale or Dr. Flores *(see, Karaduman v Newsday, Inc.,* 51 NY2d 531), the Supreme Court correctly granted partial summary judgment dismissing all causes of action against them accruing on or before April 6, 1988.

We have considered the remaining contentions of the plaintiffs and find them to be without merit.

MILLER, J. (dissenting). My dissenting colleague Justice Goldstein and I dispute the majority's conclusion that the defendants have met their burden, as movants for summary judgment, of tendering sufficient evidence to eliminate material issues of fact raised by the plaintiff *(Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851).

We shall proceed to identify several relevant issues of fact concerning the nature of the relationship between Kingsboro and Brookdale, Drs. Wolf and Levowitz, and Winston Cox, the patient of these care providers, which affect a determination of (1) whether a "relevant relationship" *(McDermott v Torre,* 56 NY2d 399, 403) exists so as to invoke the application of the doctrine of constructive participation in continuing care, thereby tolling the Statute of Limitations, and (2) the date when the plaintiffs' causes of action accrued against Dr. Levowitz and Brookdale, which would determine whether they are barred by the Statute of Limitations.

We also disagree with the majority's conclusion that the facts and circumstances thus far disclosed are so similar to those described in *Meath v Mishrick* (68 NY2d 992), *McDermott v Torre (supra),* and the other authorities cited by the majority, that they are governed by those decisions. We find significant distinctions in the character of the relationships between the treating entities and their relationship to the patient in this case, and those relied upon by the majority which raise significant issues of fact that might ultimately

warrant a finding that in this case, a relevant relationship exists.

However, at the outset, we make our position clear. The purpose of this dissent is not to persuade that the application of the doctrine of constructive participation in continuing care is warranted in this case at this stage of the proceedings. In no event do we contend that that doctrine should be automatically applied to all physicians and groups related to each other through HIP type insurance plans or HMO's or any number of other mutations of managed medical care so as to extend their potential liabilities by tolling the relevant Statutes of Limitation. Our primary objective is to point out that significant unresolved issues of fact raised herein merit resolution by the fact finder. Only at that juncture can the question of whether the relationship between the parties is "relevant" be fairly addressed.

We note as well that the issues before us are of major consequence, both to the medical profession and to the public at large. Recently, the Court of Appeals commented, in a case where the application of the doctrine of constructive participation in continuing care was obliquely referred to, that the issue was "potentially intriguing" (Ganess v City of New York, 85 NY2d 733, 736), and that it raised "weighty question[s] * * * requir[ing] considerably more thought and analysis" (Ganess v City of New York, supra, at 739 [Titone, J., concurring]).

### The Facts

We restate the facts since several which are essential to our contentions are not referred to by the majority.

The plaintiff Winston Cox, a 42-year-old teacher, was enrolled in HIP (The Health Insurance Plan of Greater New York), the provider for his insured medical care. As such, he used the services of Kingsboro Medical Group as his primary care provider. Dr. Wolf was assigned as his family or "gatekeeper" physician. It was his job to follow the patient's medical problems regularly, and to be generally responsible for his health maintenance.

On February 20, 1986, Dr. Wolf first saw Mr. Cox. The patient reported a five-year history of untreated varicose veins. He was having pain in his left leg. On March 8, 1988, the patient appeared at the "Urgent Care" or "Walk/In" services at Kingsboro complaining of the veins and an ulcer

that had appeared on his left leg. He was seen by Dr. Gross, and referred to the Kingsboro Dermatology Unit. He reappeared at the Urgent Care services 10 days later, continuing to complain of pain and was referred by a physicians' assistant to Dr. Nicholas, a general surgeon at Kingsboro, for surgical evaluation. Dr. Nicholas then referred the plaintiff to Brookdale Surgical Associates, a vascular surgery group consisting of Dr. Flores and Dr. Levowitz, the vascular surgeons who are defendants in this case. Kingsboro and Brookdale had enjoyed a relationship through HIP for over 20 years, and had developed certain customs and practices which profoundly affect our consideration of the nature of the relationship between the groups and doctors, and whether it is "relevant", thereby justifying the application of the doctrine of constructive participation in continuing care.

Kingsboro's referral slip expressly directed Brookdale to perform a venogram and/or vascular consultation. (A venogram is an invasive X-ray procedure involving injection of a dye that highlights the veins in the X-ray film and is performed by a radiologist.) However, neither on March 30, 1988, when the plaintiff appeared at Brookdale, nor at any time thereafter was the venogram performed.

In his examination before trial, Dr. Levowitz explained that Brookdale was in fact incapable of administering that test. He stated that a "custom and practice" had evolved over the many years of the relationship between Kingsboro and Brookdale whereby although the Kingsboro referral would specify a venogram, Brookdale would perform noninvasive tests, i.e., doppler and outflow studies. No further explanation of this seemingly questionable procedure was forthcoming in response to the plaintiffs' inquiries at the defendants' examinations before trial.

Although neither the Supreme Court nor the majority have considered that this unexplained and surprising practice bears significantly on the relevant nature of the relationships in issue, we do. As the subsequent history of Mr. Cox's illness leading to the ultimate amputation of his leg illustrates, the failure to perform a venogram may well have cost Mr. Cox his leg. The postamputation medical report forwarded by Dr. Flores to Dr. Wolf noted: "Looking back into this clinical case, it seems the patient has a long standing history of arteriovenous fistula", the very condition suspected by Dr. Levowitz when he earlier examined the patient and noted on his chart, "The possibility of an arterial venous fistula cannot be ex-

cluded", and recommended a venogram, which, for reasons to be discussed hereafter, even then was not performed.

The noninvasive tests that Brookdale did perform on the plaintiff on March 30, 1988, indicated the lack of any acute venous thrombotic occlusion, and that the resulting data was basically within normal range. In a letter dated April 1, 1988, Dr. Levowitz authored a report reflecting those findings, reciting that plaintiff underwent "compressive venous pneumoplethysmography and venous doppler study" and was found to have circulation within normal limits. The ulceration was attributed to "a post-phlebitic syndrome with a recanalized deep vein and incompetent valve in the communicating perforated veins". Apparently, as far as Brookdale was concerned, its obligations pursuant to Kingsboro's referral were fulfilled with the execution and remittance of that report. However, Mr. Cox's version of the facts contradicts that conclusion.

According to Mr. Cox, he was told by the tester, Dr. Rosario, that he must return to see a Brookdale doctor. When, on April 6, 1988, the plaintiff appeared at Dr. Levowitz's office, he was examined by Dr. Levowitz, either by appointment or as a courtesy as Dr. Levowitz testified. It is undisputed that Dr. Levowitz took the patient's history, examined him, performed a second doppler study, and expressed concern that the tests performed one week earlier were *insufficient* to locate the cause of plaintiff's problems, and that an "[a]dditional report" would be made to Dr. Wolf. The Brookdale records prepared by Dr. Levowitz recite the following: *"New patient.* Chief complaint: deep vein thrombosis left lower extremity. Patient had maimum *[sic]* venous outflow study on 3/30/88 which was considered normal * * * Patient is a school teacher who stands most part of the day and finds excessive discomfort in the ankle region on the left. Identification of the cause of the patient's problem not apparent. Will require extensive investigation including *venography* and possibly MRI to determine the cause. The possibility of an arterial venous fistula cannot be excluded. The ulceration appears to be varicose in origin by virtue of its location where there is stasis dermatitis. *Additional report to Dr. E. Wolf of the Kingsboro Medical Group"* (emphasis supplied). Ironically, Dr. Levowitz intended to return the patient back to the referring doctor, recommending the very test (venogram) that his group was instructed to perform and failed to administer!

Tragically, for Mr. Cox, this additional report was not forwarded to Dr. Wolf, nor was he or any other doctor ap-

prised by Dr. Levowitz of his examination of the patient and of his serious concerns as to his condition. At his examination before trial, Dr. Levowitz's equivocal explanation was that his reference to an "[a]dditional report to Dr. E. Wolf" was intended solely as a reminder *to himself* to send an additional report at such time as Mr. Cox would return to him for further treatment.

The doctor's testimony supports Mr. Cox's claim that he expected to return to Dr. Levowitz for further treatment.

"Q. Did you expect Mr. Cox to come back to you?

"A. I anticipated that he would.

"Q. The same way he came to you on April 6 or in a different way?

"A. No, with a referral sheet."

If found credible, this explanation (that Dr. Levowitz failed to send the additional report because he anticipated the patient's return) would support Mr. Cox's contention that his relationship with Dr. Levowitz was a continuing one, not ending on April 6, 1988, but continuing at least until his return to Dr. Wolf on June 9, 1988, when he reasonably expected this report to have been forwarded to Dr. Wolf. Accepting that analysis, the Statute of Limitations arguably would not have run against his cause of action *(see, Richardson v Orentreich,* 64 NY2d 896, 898). Moreover, the continuing nature of Mr. Cox's relationship with Levowitz and Wolf also supports his contention that he relied on both of them, warranting the application of the doctrine of constructive participation in continuing care *(see, Borgia v City of New York,* 12 NY2d 151).

When, on June 9, 1988, Mr. Cox next returned to Dr. Wolf at Kingsboro to discuss his condition and the results of the vascular examination, although he attempted to convince the referring doctor that Dr. Levowitz recommended further testing, he was unsuccessful. Dr. Wolf, having only Brookdale's April 1, 1988 report before him and nothing reflecting Dr. Levowitz's examination, insisted that no further testing was necessary. Dr. Wolf thus continued what turned out to be an inappropriate course of treatment that allegedly necessitated the amputation.

Mr. Cox's condition worsened and 16 months later, on August 21, 1989, he presented himself at Kingsboro in acute pain and was sent to the emergency room at Brookdale Hospital, where he met Dr. Flores, who, unbeknownst to plaintiff, was affiliated with Dr. Levowitz and Brookdale Surgi-

cal Associates. Dr. Flores amputated the patient's left leg above the knee on September 13, 1989.

The injured plaintiff commenced this action against all the defendants to recover damages for medical malpractice and failure to obtain his informed consent. The plaintiff's wife commenced a derivative action. All the defendants were served in November 1990, and all of their answers interposed the Statute of Limitations as an affirmative defense. After the depositions of Mr. Cox and the defendants were concluded, the defendant Levowitz moved for summary judgment dismissing all claims as time barred, contending his sole and last contact with plaintiff was on April 6, 1988, two years and seven months prior to service of the complaint upon him, on November 8, 1990. By the same motion partial summary judgment was sought by Brookdale and Flores for treatment rendered prior to April 6, 1988. In opposition, the plaintiffs argued that the Statute of Limitations should be tolled by application of the doctrine of constructive participation in continuous treatment, reasoning that the defendants were jointly involved in Mr. Cox's treatment and engaged in a "relevant relationship". Moreover, Mr. Cox claimed to have a direct continuing doctor-patient relationship with Dr. Levowitz at least until June 9, 1988, when he returned to Dr. Wolf anticipating that the report Dr. Levowitz dictated in his presence would have been received, and therefore his action against Levowitz and Brookdale was timely since Dr. Levowitz was served on November 8, 1990, not more than two years and six months later.

The Supreme Court granted the defendants' motion, and dismissed the complaint insofar as asserted against Dr. Levowitz and all causes of action accruing in 1988 against Dr. Flores and Brookdale, finding that the last treatment date relevant to these defendants was April 6, 1988, and that the doctors were independent contractors lacking the requisite "relevant relationship" with Kingsboro, thus precluding any toll of the Statute of Limitations premised on a theory of constructive participation. Consequently, the court dismissed the causes of action asserted against Dr. Flores and Brookdale based upon vicarious liability since the malpractice action against Dr. Levowitz was found to be time barred.

We would reverse and permit this case to go to trial against all the defendants since, as indicated, material issues of fact exist bearing on the date Mr. Cox's cause of action accrued against Dr. Levowitz, his relationship with Dr. Levowitz, and the relationships of the groups and doctors with each other

*(see, Ogle v State of New York,* 142 AD2d 37; *Colonresto v Good Samaritan Hosp.,* 128 AD2d 825; *Watkins v Fromm,* 108 AD2d 233). Such factual issues include:

1. *The Venogram Enigma:*

a. Why did Kingsboro routinely refer patients to Brookdale for venograms, knowing Brookdale had no capacity to perform them, and will perform noninvasive tests instead?

b. Why did Brookdale accept such referrals, knowing it could not perform tests pursuant to the written request, but performs noninvasive tests instead?

c. What procedures (if any) would permit a patient so referred to obtain a venogram eventually?

d. Are there other similar customs and practices that have developed between the groups over their 20 years of association?

e. Do these customs and practices result from contractual or fee arrangements through HIP?

2. *Dr. Levowitz's failure to communicate his findings.*

a. Was Dr. Levowitz credible, when he testified that he didn't forward an "[a]dditional report" to Dr. Wolf as noted in his chart because he expected the patient to return, or was he simply negligent in failing to send it?

b. Assuming his testimony was found credible, by what procedure would the patient's return to him be accomplished?

c. Assuming he was simply negligent in failing to send the report after the April 6, 1988 visit, would he customarily have sent such a report the same day as the visit? During what period of time? What period of time would be reasonable?

d. Was his failure to communicate related to the fact he could not charge for the visit pursuant to the HIP contract?

e. Could Dr. Levowitz have ordered a venogram for the patient on April 6, 1988, when he examined him and noted its appropriateness? If not, what provision of the HIP contract or any other agreement, would have prevented him from doing so?

3. *How was the patient affected by the two groups' relations with each other?*

a. Could Mr. Cox have demanded that a venogram be performed by Brookdale, as Kingsboro requested?

b. Could Mr. Cox have insisted that Dr. Wolf call Dr. Levowitz to resolve the conflicting opinions he had been given?

c. Could Mr. Cox have requested a second opinion from a different specialist? A different primary care physician?

d. Did Mr. Cox rely on both Dr. Levowitz and Brookdale for the treatment of his condition?

4. *How closely related were Kingsboro and Brookdale?*

a. Was Brookdale the only vascular surgical group to which Kingsboro referred patients? If not, what percentage of its patients were referred to Brookdale?

b. What were the terms of any written contract or oral agreement relating to the group's relationships through HIP or otherwise?

In view of the significant issues of fact to be resolved, we dispute the majority's contention that the defendants established their entitlement to judgment as a matter of law by merely pleading the Statute of Limitations as a defense. The burden on a motion for summary judgment is on the movant to tender sufficient evidence to eliminate all material issues of fact *(Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851, *supra).* The plaintiffs opposed the defendants' motion for summary judgment based upon the affirmative defense of Statute of Limitations by contending the doctrine of continuing care and constructive participation applied (given the relevant relationships involved). It was incumbent on the defendants to eliminate factual issues regarding those relationships and to demonstrate that no relevant relationship existed *(see, Ann Mary J. v City of New York, Health & Hosps. Corp.,* 204 AD2d 690, 691-692), particularly where, as here, the facts and circumstances regarding the relationships between the groups and doctors are peculiarly within the knowledge of the defendants *(see, Colonresto v Good Samaritan Hosp.,* 128 AD2d 825, *supra).* Nor can the plaintiffs be faulted for failing to elicit such facts during discovery proceedings, particularly in this case where the defendants' responses to the plaintiffs' inquiries were frequently blocked by the defendants' counsel's objections or were nonresponsive.

## The Law

The theory of constructive participation in continuous treatment so as to toll the expiration of the Statute of Limitations in a medical malpractice action, appears to have had its genesis in the case of *Fonda v Paulsen* (46 AD2d 540). In that case, a biopsy performed on a mass on the plaintiff's right buttock was allegedly misread and three years later when a

second biopsy was performed, the initial mass was found to be malignant. The Court found that the then-applicable three-year malpractice Statute of Limitations as against the pathologist, had been tolled by the continuous treatment provided by the two defendant treating physicians. The Court held that it was appropriate to impute to the pathologist constructive participation in the patient's subsequent treatment as long as it continued, thereby making the practitioner subject to the same Statute of Limitations period as those who continued to treat the patient relying upon the initial misdiagnosis.

The reach of *Fonda v Paulsen (supra)* was greatly curtailed by two Court of Appeals decisions upon which the Supreme Court in this case has relied *(see, McDermott v Torre,* 56 NY2d 399, *supra; Meath v Mishrick,* 68 NY2d 992, *supra).* In *McDermott v Torre (supra),* a mole excised by a dermatologist was sent to a lab where the pathologist determined it was benign. The patient continued under the care of the referring doctor who assured her that the biopsy was negative. Four years later, however, a malignant melanoma was discovered at the site of the original mole. The Court of Appeals dismissed the cause of action against the laboratory, holding that constructive participation in continuous treatment did not apply since the act of the laboratory was a single and discrete one, and the laboratory had neither a continuing nor relevant relationship with the patient, nor any relevant association with the referring doctor. The Court pointed out that a lab has no opportunity to discover an error in a report, but must rely on the treating physicians to discover any error. Thus, the Court reasoned that the policy underlying the continuing treatment doctrine generally will not be applicable to an independent laboratory.

In *Meath v Mishrick (supra),* decided four years later, the patient was admitted to a hospital in 1977 for removal of a growth behind her ear. The pathologist at the hospital removed a sample of tissue and found no malignancy. In 1982, when she was admitted for further tests, a malignant melanoma was discovered at the site of the original growth. In 1983, the original biopsy was reviewed by another hospital and found that it contained malignant cells. A medical malpractice action was brought against the referring doctor, the pathologist, and the hospital. All three moved for summary judgment based upon the Statute of Limitations. Relying on *McDermott v Torre (supra),* the Court of Appeals held that the independent pathology lab was not potentially liable pursuant

to the theory of constructive participation in continuous treatment. In essence, the Court held that no different rule should be applied in *Meath* than was applied in *McDermott* simply because the misreading was by a pathologist working in the hospital laboratory rather than an outside lab. The difference, the Court held, did not indicate an agency or other relevant relationship between the doctors and the lab.

The majority's reliance upon *Meath v Mishrick (supra)* and *McDermott v Torre (supra)* ignores significant distinctions which set this case apart.

Unlike the facts in those cases where only a pathology lab's report was involved, the patient in this case was personally examined by Dr. Levowitz who took his history, performed a doppler study, discussed his case, noted on his chart that he was a "[n]ew patient" and what his condition was, and indicated that an "[a]dditional report" would be sent to the referring physician. In neither *Meath* nor *McDermott* does it appear that the pathologist came into any direct contact with the patient. While this distinction in and of itself does not, as the majority correctly notes, warrant the application of the doctrine of constructive participation in continuing care, it supports Mr. Cox's contention that he considered himself to be under the care of both Drs. Levowitz and Wolf, whom he had reason to regard as his physicians at least until June 9, 1988.

In *Meath* and *McDermott* the pathologist's role was discrete and complete at the time the pathologist's report was forwarded to the referring physician, whereas, in this case, Dr. Levowitz expected that the patient would return and expected to write a report at a later time. Moreover, in contrast to the laboratory cases cited, where incorrect diagnosis was the gravamen of the causes of action sounding in negligence, here the failure to communicate a correct diagnosis is the negligent act on which the medical malpractice is predicated and the date of accrual of the cause of action against Dr. Levowitz is an unresolved issue of fact.

Most significantly, this case is notably distinguishable not only from *Meath* and *McDermott,* but also from *Pierre-Louis v Ching-Yuan Hwa* (182 AD2d 55), *De Peralta v Presbyterian Hosp.* (121 AD2d 346), *Swartz v Karlan* (107 AD2d 801), and others cited by the majority, by the customs and practices between Kingsboro and Brookdale, which materially affected Mr. Cox's treatment, and reflected an ongoing interrelationship between the groups and doctors which might, upon full

examination, be deemed "relevant". No such customs and practices exist in any of the other cases cited.

It can hardly be disputed that Brookdale's failure to perform the venogram not only relates meaningfully to the plaintiffs' malpractice causes of action, but to the nature of the interrelationships at issue. The "custom and practice" whereby Kingsboro routinely directed Brookdale to perform venograms knowing that Brookdale was incapable of performing them, and where Brookdale failed to order the venogram even after Dr. Levowitz recognized its necessity, because the "rules" or "contracts" or "customs" governing their relationship required that he await the patient's second referral, clearly set this case apart from those relied upon by the majority. Only after the facts explaining these rules, customs, or contracts are elicited at trial can the nature of these relationships and their "relevance" be determined.

A further distinguishing factor already alluded to should be noted. Here, the negligence complained of by Mr. Cox was not a misdiagnosis made by Dr. Levowitz on April 6, 1988, at the time of his visit, a discrete act resembling the misdiagnosis of a biopsy as in *Meath* and *McDermott,* but rather the doctor's failure to communicate his correct diagnosis to the referring physician, a failure of communication that may have cost Mr. Cox his leg. Consequently, Mr. Cox's cause of action against Dr. Levowitz did not necessarily accrue on April 6, 1988, when he was examined, and the correct diagnosis was made, but arguably at such time as the report reflecting that examination should reasonably have been received by Dr. Wolf. If that "reasonable time" were found to extend until June 9, 1988, when he returned to Dr. Wolf to discuss the results of Brookdale's tests, his action against Dr. Levowitz would not be timed barred *(see, Richardson v Orentreich,* 64 NY2d 896, *supra).*

The policy considerations underlying the continuous treatment doctrine expressed in *Borgia v City of New York* (12 NY2d 151, *supra),* while not applicable to the cases of *Meath v Mishrick* (68 NY2d 992, *supra)* or *McDermott v Torre* (56 NY2d 399, *supra),* might well be applicable in this case. The fact finder could determine that Mr. Cox had reason to believe his care was the responsibility of both Kingsboro and Brookdale, of Drs. Wolf and Levowitz. Therefore, Mr. Cox might well have felt reluctant or incapable of terminating his relationship with either of them, or even insisting that one or the other was in error, or indeed, compelling by legal action or

otherwise one or both of them to satisfy his concerns, and explain their apparent contradictory opinions. As noted by the *Borgia* Court, it would be absurd to expect a patient to interrupt the corrective efforts made on his behalf by taking legal action *(see, Watkins v Fromm,* 108 AD2d 233, *supra).*

We recognize that the very nature of medicine as it is practiced today pursuant to insurance plans, managed care, and a multitude of differing arrangements, inevitably produces a degree of dependence and interrelationship between primary care physicians and specialists. We do not imply that such dependency, regardless of degree or character, should necessarily justify the application of the doctrine of constructive participation in continuing care, imputing the negligence of one to the other and thereby extending the Statute of Limitations. It is obvious that such a result could egregiously increase the exposure of the medical profession to enormous and often unwarranted liability, at a high cost to both the medical profession and ultimately the public.

On the other hand, we also recognize that the changes in medical care also inevitably bring with them an increase in the proliferation of forms and other red tape as well as the potential for the delay of patient care and the increased possibility for failure of communication, where the patient may fall through the cracks in the very manner alleged to have occurred in this case.

Therefore, it is important that the determination of whether a relevant relationship exists be made in each case based upon the independent facts and circumstances surrounding that patient's care and his relationship with his respective physicians. No simple, single rule can fairly govern the countless variations that clearly already exist and the changes that will undoubtedly be forthcoming. Guidance regarding the requisite nexus or interdependency that will be held to justify imputing the liability of one physician to another in the context of current medical practice has yet to be provided by our appellate courts or the State's highest Court.

We dissent because we believe that the plaintiffs in this case, as well as the medical profession and the public are entitled to a careful review and determination of the complex issues of fact and law presented herein and that summary judgment was therefore erroneously granted.

Therefore, we would reverse the order appealed from and remit the matter to the Supreme Court for trial and resolution of the critical issues involved.

BRACKEN, J. P., and RITTER, J., concur with SULLIVAN, J.; MILLER and GOLDSTEIN, JJ., dissent in a separate opinion by MILLER, J.

Ordered that the order is affirmed, with costs.

On the Court's own motion, it is

Ordered that the appellants, if they be so advised, are granted leave to appeal to the Court of Appeals pursuant to CPLR 5602 (b) (1) from the opinion and order of this Court dated September 18, 1995, which affirmed an order of the Supreme Court, Kings County, dated September 13, 1993, and the following question is certified to the Court of Appeals: Was the opinion and order of this Court dated September 18, 1995, properly made?

Questions of law have arisen, which, in our opinion, ought to be reviewed by the Court of Appeals (see, CPLR 5713).